[This opinion has been published in *Ohio Official Reports* at 76 Ohio St.3d 324.]

THE STATE OF OHIO, APPELLEE, *v*. AWKAL, APPELLANT.

[Cite as *State v. Awkal*, 1996-Ohio-395.]

*Criminal law—Aggravated murder—Death penalty upheld, when.*

(No. 95-1132—Submitted March 6, 1996,—Decided August 14, 1996.)

APPEAL from the Court of Appeals for Cuyahoga County, No. 66291.

————————————

{¶ 1} On January 7, 1992, appellant, Abdul Hamin Awkal, shot and killed his estranged wife, Latife Awkal, and his brother-in-law, Mahmoud Abdul-Aziz, at the Family Conciliation Services Department of the Cuyahoga Domestic Relations Court. Appellant was captured in the courthouse basement not far from where the shooting took place.

{¶ 2} Awkal arrived in the United States from Lebanon about 1984, when he was twenty-four. He lived with family members in Detroit, Michigan, and worked as a dishwasher and gas station attendant. In 1985, Awkal suffered a mental breakdown at the gas station after he believed he had been accused of theft by his employer. He became hysterical, cursing and breaking things, vomited and then collapsed. He was taken to Detroit Medical Center in a straitjacket. Awkal was apparently released into his brother's custody later that same day, but disregarded instructions to follow up with a psychiatrist.

{¶ 3} Later, Awkal began working at a General Motors' factory in Michigan. He was eventually transferred to the Chevrolet plant in Parma, Ohio. He had difficulty sleeping during this period, and was prescribed medication to help him sleep.

{¶ 4} Awkal's family arranged for him to meet his wife, Latife, after his arrival in Cleveland. This type of arranged marriage was common in his Islamic faith. Awkal's need for sleeping pills diminished after he met his wife. Awkal and

Latife were married under Islamic law in March 1989 and under Ohio law in April 1989. Later in 1989, Awkal went to Cleveland Metropolitan General Hospital complaining of numbness down his side. Although Awkal was again told to talk to a psychiatrist, he never did so. Awkal and Latife had a daughter, Zaynab, born in September 1990.

{¶ 5} On their honeymoon, Latife told Awkal she did not love him, but that she understood that love would follow. He unsuccessfully attempted to improve their relationship by opening a bank account for her, teaching her to drive, encouraging her to attend school, and helping her parents with various household tasks.

{¶ 6} Latife and her brothers felt that Awkal was not a good Muslim. Awkal did not spend sufficient time in daily prayer and he enjoyed music and celebrating Christian holidays, such as Christmas. Latife and her brothers did not listen to music, or celebrate Christian holidays, and prayed five or six times a day. Latife's brother, Mahmoud Abdul-Aziz, tried to teach Awkal the tenets of their family's Islamic faith, but Awkal viewed Mahmoud's actions as interference with his freedom, and believed that he was harassed and threatened by Mahmoud because of his religious beliefs.

{¶ 7} Awkal's marital life was dissolving. Latife spent many nights away from Awkal and eventually asked for an Islamic divorce. According to Awkal, a Muslim husband may divorce his wife merely by telling her "I divorce you, I divorce you, I divorce you." Awkal granted her request on October 13, 1991, but then Latife agreed to remarry him under Islamic law. Latife felt that she had been shamed and that her baby had been made illegitimate by the divorce.

{¶ 8} On October 16, 1991, Latife found out that she had contracted a venereal disease from Awkal. The next day, Latife moved out of the marital home, moved in with Mahmoud, and started divorce proceedings. A divorce complaint

and motions for spousal support, child support, visitation and restraining orders were filed in October 1991. Latife talked of returning to Lebanon with the baby.

{¶ 9} Awkal was hurt by his family problems and sought counseling, but declined medication. Awkal had counseling sessions four times in November 1991, because he was depressed and suicidal. These feelings were brought on by the divorce and Awkal's belief that Latife's brothers and their religion had interfered with his life and his marriage. Awkal's psychological records reflect that he was very angry with Latife and her brothers because of the divorce.

{¶ 10} On November 8, 1991, Awkal bought a nine-millimeter semi-automatic pistol, allegedly to defend himself from Latife's brothers. The evening of that same day and the morning of the next, Awkal called Latife and her brother, Omar Abdul-Aziz, threatening to kill her and her entire family if the divorce was not dismissed. Latife reported the call to her divorce attorney, who sent a letter to Awkal's attorney regarding the threats.

{¶ 11} Awkal attended hearings in his divorce case on December 10, 17, and 19, 1991, without incident. During this period, Awkal and Latife agreed to a child visitation schedule and temporary child and spousal support. At Latife's insistence, the visitation order prohibited Awkal from participating in any Christmas-related activities with the baby during his visitation. Awkal also agreed that the family checking accounts, containing approximately $4,800, which had been frozen by the domestic relations court, were to be equally divided between Latife and Awkal.

{¶ 12} A meeting was scheduled for 2:00 p.m. on January 7, 1992, at the Family Conciliation Services Department, Room 52, located in the basement of the old Cleveland courthouse. Latife came early to the meeting with her brother, Mahmoud, and her baby. They waited in the hall outside for Awkal to arrive.

{¶ 13} Awkal arrived at the courthouse parking garage at 1:48 p.m. from Michigan, where he had spent the weekend with relatives. On his person were

copies of the baby's medical records, which had been checked out from the treating HMO over a month earlier, and numerous childcare supplies, including diapers, baby food, and clothing. Prior to the meeting, Awkal wrote a check to his brother for nearly the entire contents of the frozen checking accounts, and changed his address at the post office to his brother's house in Michigan.

{¶ 14} Awkal confronted Mahmoud and Latife in the hallway at approximately 2:00 p.m. No harsh words or raised voices were heard from the hall before the shooting. However, "panicky" voices were heard immediately before the three entered Room 52. Awkal chased Latife and Mahmoud into the room, where he shot his wife and her brother at close range. Five shell casings were found inside the room; one shell casing was found in the hall outside the room.

{¶ 15} Awkal then picked up the baby from the bench outside the room and walked quickly through the basement halls of the courthouse with her in his arms. Several armed deputies confronted Awkal in the hallway. Awkal pointed his gun at his head and then at his daughter's head, threatening to kill her and then himself. Awkal vowed that nobody was going to take his baby.

{¶ 16} When a deputy tried to grab Awkal's gun, Awkal backed further down the hall with the baby. While proceeding down the hall, Awkal was confronted by another deputy, who attempted to disarm Awkal. Awkal evaded this attempt, but was shot in the back while trying to escape.

{¶ 17} When Awkal was taken into custody, his pistol was cocked, ready to fire, and contained six live rounds (one in the chamber; five in the magazine). Awkal also had another magazine containing thirteen rounds of live ammunition in his coat pocket. The bullets retrieved from Mahmoud's body and from Room 52 were fired from Awkal's gun.

{¶ 18} At the hospital the next day, Awkal, after being advised of his *Miranda* rights, told police that he had confronted Mahmoud in the hallway and demanded that Mahmoud "profess that Allah was the only God." When Mahmoud

did not do so, Awkal shot the victims. Awkal stated that he thought that he had shot himself.

**{¶ 19}** Awkal was indicted on two counts of aggravated murder with prior calculation and design, including the multiple-murder death penalty specification. He was also indicted on two counts of felonious assault, including a firearm specification. Awkal pled "not guilty" and "not guilty by reason of insanity" to the charges against him.

**{¶ 20}** While awaiting evaluation by a court-appointed psychiatrist to determine whether he was sane and competent to stand trial, Awkal reportedly had hallucinations involving his wife, who spoke to him and told him to join her. Two psychiatrists had examined Awkal at the county jail and found him to be depressed and angry. Awkal was prescribed anti-depressant and anti-anxiety drugs. These drugs did not stop him from having the hallucinations, and he was prescribed different anti-psychotic and anti-depressant medications.

**{¶ 21}** Awkal was found sane at the time of the murders in the preliminary sanity report. However, the severity of his depression rendered him incapable of aiding with his defense, and the trial court found Awkal not competent to stand trial. He was ordered to the Dayton Mental Health Center, Forensic Unit, for treatment and further evaluation. During his stay in Dayton, Awkal continued to receive anti-psychotic medication, but at greater levels. He was also placed on anti-depressant and anti-anxiety medications. On September 3, 1992, the trial court found Awkal competent to stand trial, but returned him to Dayton for further treatment until the trial started.

**{¶ 22}** In October 1992, a jury was impaneled. During the trial, defense counsel complained to the court that Awkal's condition had deteriorated and suggested that a new competency evaluation be undertaken. The trial court refused to have Awkal reevaluated, but stated that it would watch Awkal closely to see that he was paying attention to the trial and helping with his own defense. After the

state closed its case in chief, the trial court dismissed one of the felonious assault charges.

{¶ 23} Several witnesses testified on Awkal's behalf during the guilt phase. Dr. Paul E. Hewitt, a psychologist, was called to give an opinion on the issue of prior calculation and design. However, when the court learned that Dr. Hewitt was not a licensed psychologist in Ohio, his testimony was stricken from the record. Dr. Magdi S. Rizk, the psychiatrist who conducted Awkal's pretrial sanity and competency evaluations, testified that Awkal was sane at the time of the murders. Finally, Dr. Eileen S. McGee, a psychiatrist awaiting board certification, testified that Awkal was insane at the time of the shooting, that he did not know what he did was wrong, and that Latife and Mahmoud had provoked the incident.

{¶ 24} Awkal testified on his own behalf. He stated that Mahmoud and Latife's other brothers were religious fanatics, and had harassed him and interfered in his life. Awkal testified that he purchased the gun to protect himself from Latife's brothers, who had threatened him and, on one occasion, forced him to kneel down before them, swearing allegiance to their religious sect. He denied threatening Latife or her brother.

{¶ 25} Awkal stated that on the morning in question he met Latife in the hallway of the courthouse, and asked her to come back to him. She refused, and he went back to his car to get his gun, intending to kill himself in front of Latife to make her regret her decision to divorce him. When Awkal returned he asked Latife if he could hug his daughter one last time. Latife agreed, but Mahmoud confronted Awkal, stating that the baby was not Awkal's, and that Awkal would never see her again. Awkal testified that Mahmoud's face "turn[ed] into that of a monster" and that the walls then collapsed. The next thing Awkal knew, he awoke in the hospital.

{¶ 26} On rebuttal, the prosecution presented Dr. Edward Dutton, a forensic psychiatrist, who testified that Awkal was malingering, that he understood what he had done was wrong, and that he had acted out of anger.

{¶ 27} The jury found Awkal guilty as charged on the aggravated murder charges, but not guilty on the remaining felonious assault charge.

{¶ 28} Several witnesses, including Drs. Paul Hewitt, Eileen McGee, and Salah Samy, testified on Awkal's behalf during the penalty phase. Dr. Hewitt testified that Awkal's problems were part of a life-long anxiety problem, and believed that Mahmoud's threats and religious fanaticism were extremely strong provocation and had facilitated the shooting. Dr. Hewitt believed that Awkal's reaction was spontaneous and that he did not have the ability to conform his conduct to the requirements of Ohio law when he committed the murders.

{¶ 29} Dr. McGee testified that the religious interference of Mahmoud and his brothers was a strong provoking force in the murders. Dr. McGee also testified that Awkal's reaction was triggered by Mahmoud's provocation, and that Awkal did not have the ability to conform his conduct to the requirements of the law of Ohio when the murders occurred.

{¶ 30} Dr. Samy, Awkal's treating psychiatrist in Dayton, testified that Awkal was not malingering, and that he lost his judgment and control and awareness of what he was doing just prior to the murders. Dr. Samy testified that Awkal was not sane at the time of the murders. Dr. Samy also believed that Latife and Mahmoud facilitated the incident.

{¶ 31} Awkal gave an unsworn statement, in which he explained his childhood situation, his religious problems with his brothers-in-law, and how these religious problems caused his marital problems. He also talked about how after Mahmoud's face became that of a monster, the walls collapsed down upon him. The next thing Awkal knew, he woke up in the hospital.

{¶ 32} The prosecution rebutted this testimony with Dr. Edward Dutton, who believed that Awkal was malingering.

**{¶ 33}** The jury found Awkal guilty of the aggravated murder charges and recommended death. The trial court agreed and imposed the death penalty. The court of appeals affirmed the decision of the trial court.

**{¶ 34}** The cause is presently before this court on appeal as of right.

_____

*Stephanie Tubbs Jones*, Cuyahoga County Prosecuting Attorney, *George J. Sadd* and *Richard J. Bombik*, Assistant Prosecuting Attorneys, for appellee.

*McGinty, Gibbons & Hilow Co., L.P.A., Henry J. Hilow* and *Kevin M. Spellacy,* for appellant.

_____

**PFEIFER, J.**

**{¶ 35}** Appellant raises fourteen propositions of law. We have reviewed each one and have determined that none justifies the reversal of appellant's convictions for aggravated murder or of the sentence of death.

I

Evidentiary Issues

A

Insufficient Evidence

**{¶ 36}** In propositions Nos. I and II, Awkal argues that the evidence proving his guilt is insufficient. Awkal argues that the busy location and the fact that the shooting took place in front of witnesses indicate that this was a "spur of the moment" shooting or impulse murder. This argument is without merit. The length of time pondering the crime does not determine whether an accused acted with prior calculation and design.

**{¶ 37}** " '[P]rior calculation and design' requires 'a scheme designed to implement the calculated decision to kill.' In addition, '[n]either the degree of care nor the length of time the offender takes to ponder the crime beforehand are critical factors in themselves,' but 'momentary deliberation' is insufficient." *State v.*

*D'Ambrosio* (1993), 67 Ohio St.3d 185, 196, 616 N.E.2d 909, 918, quoting *State v. Cotton* (1979), 56 Ohio St.2d 8, 11, 10 O.O.3d 4, 6, 381 N.E.2d 190, 193; Legislative Service Commission Comment to R.C. 2903.01.

{¶ 38} The record reflects that Awkal harbored anger against his wife and her family. Awkal felt that Mahmoud interfered with his family and harassed Awkal. Prior to the shooting, Awkal threatened to kill his wife and her family, and bought a gun. On the day of the shooting, Awkal changed his address at the post office and issued a check to his brother for almost the entire balance of the family checking accounts. Before going the courthouse, Awkal stocked his car with baby care items, including food and clothing. He then confronted Latife, Mahmoud, and the baby in the hall outside Room 52. Awkal then followed Latife and Mahmoud into Room 52 where the shooting occurred. He shot each victim at least three times. The sequencing of the shots also implies that he intended to kill both victims. Awkal also had a spare magazine containing thirteen live rounds in his coat pocket on the day in question.

{¶ 39} "'The standard [for determining the sufficiency of the evidence] * * * is whether, after viewing the evidence in a light most favorable to the prosecution, a reasonable jury could have found the essential elements of the crime beyond a reasonable doubt.'" *State v. Davis* (1988), 38 Ohio St.3d 361, 365, 528 N.E.2d 925, 930, citing *Jackson v. Virginia* (1979), 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560. Accord *State v. Jenks* (1991), 61 Ohio St.3d 259, 574 N.E.2d 492, paragraph two of the syllabus.

{¶ 40} When the evidence is viewed in a manner most favorable to the prosecution, a reasonable fact finder could find that Awkal acted with prior calculation and design in killing Latife and Mahmoud. These propositions are without merit.

B.

State of Mind / Hearsay Evidence

{¶ 41} In proposition No. IV, Awkal incorrectly argues that the trial court erred in permitting the prosecution to elicit hearsay testimony from Latife's divorce attorney regarding statements allegedly made to Latife by Awkal. The prosecution called Latife's divorce attorney to testify regarding telephone threats made to Latife by Awkal on November 8, 1991. Counsel testified to what Latife told her, and that counsel then sent Awkal's divorce attorney a letter concerning the alleged threats. Awkal argues this was hearsay within hearsay, and was inadmissible under Evid. R. 805.

{¶ 42} The trial court admitted the evidence under Evid. R. 803(3), as a statement of "then existing state of mind, emotion, sensation, or physical condition." In *State v. Apanovitch* (1987), 33 Ohio St.3d 19, 514 N.E.2d 394, this court discussed the admissibility of evidence reflecting a victim's fearful state of mind. However, the court limited this type of testimony to that reflecting the state of mind of the victim, but not the reasons underlying that state of mind. Id. at 21-22, 514 N.E.2d at 398. Further, the testimony must point forward in time rather than to the past. Id. at 21-22, 514 N.E.2d at 398. Portions of the testimony in question here exceed the scope of the rule discussed in *Apanovitch*.

{¶ 43} Latife's divorce attorney arguably testified to Latife's mental state on November 8, 1991. Yet, she did not testify that Latife was upset or in fear for her life. However, she did testify that Awkal threatened to kill Latife and her family. Admitting this testimony was error under *Apanovitch*. Id. However, Latife's brother, Omar Abdul-Aziz, also testified that he received a call from Awkal on November 9, 1991, threatening the family members if the divorce was not dismissed. This testimony was proper. Thus, divorce counsel's testimony duplicated Omar's testimony and admission of the divorce counsel's testimony was harmless beyond a reasonable doubt. *State v. Lundgren* (1995), 73 Ohio St.3d 474, 485, 653 N.E.2d 304, 318.

{¶ 44} Latife's divorce counsel also drafted a letter to Awkal's counsel concerning Awkal's threats. This letter was admitted into evidence. The content of the letter is not limited to Latife's state of mind. Instead, it focuses upon the alleged threats or "harassment" by Awkal. [*Id.*] Thus, admission of the letter was also error, as its only purpose was to establish Awkal's threats to Latife and her family. However, given the volume of evidence against Awkal, this error was harmless beyond a reasonable doubt. See id.

## C

### Psychological Expert

{¶ 45} In proposition No. V, Awkal contends the court improperly excluded the testimony of Dr. Hewitt because he was not a licensed psychologist in Ohio. Awkal contends that Dr. Hewitt possessed the requisite knowledge, skill, and experience in his field to give an expert opinion, under Evid. R. 702, on the issue of prior calculation and design. This proposition is without merit.

{¶ 46} Determinations of expert witness qualifications to testify are within the discretion of the trial court. *State v. Bidinost* (1994), 71 Ohio St.3d 449, 453 644 N.E.2d 318, 322. Thus, all questions concerning the admission or exclusion of this type of evidence are considered on an abuse of discretion basis. *Id.*

{¶ 47} Appellant argues that the licensure question goes to the weight, not the admissibility, of the evidence. Appellant is correct. Where expert testimony *has been admitted*, the licensure issue goes to the weight of the evidence. Id. at 454, 644 N.E.2d at 323. However, where, as here, the evidence has been excluded, the issue is whether the court abused its discretion in doing so. *Id*. See *State v. Grant* (1993), 67 Ohio St.3d 465, 475, 620 N.E.2d 50, 64; *Alexander v. Mt. Carmel Med. Ctr.* (1978), 56 Ohio St.2d 155, 157, 10 O.O.3d 332, 333, 383 N.E.2d 564, 565; *State v. Maupin* (1975), 42 Ohio St.2d 473, 479, 71 O.O.2d 485, 488, 330 N.E.2d 708, 713.

{¶ 48} Dr. Hewitt had experience that may have been helpful to the jury. However, he was not individually licensed as a psychologist in Ohio. Nor was he qualified as a forensic psychologist. As a non-physician, Dr. Hewitt was not competent to give an opinion on the sanity issue. Under those circumstances, the court determined that it would not let him testify and give an expert opinion on the issue of prior calculation and design. The trial court had the discretion to exclude the testimony. Doing so was not an abuse of discretion. Even if it were, identical testimony was presented by defense expert Dr. McGee. Thus, Dr. Hewitt's testimony duplicated portions of Dr. McGee's testimony and excluding this testimony did not prejudice appellant.

D

Malingering

{¶ 49} In proposition No. VII, Awkal argues that the trial court committed plain error when it permitted Dr. Dutton to testify that Awkal was malingering. Appellant contends that this testimony was nothing more than an opinion that Awkal was lying about his hallucinations and was intended to be evidence of Awkal's allegedly poor character. This proposition is without merit.

{¶ 50} Appellant presented an insanity defense, and supported that defense with evidence of the hallucinations. Thus, he placed his psychological status and competency at issue. Therefore, the prosecution was entitled to attack the existence of the hallucinations when rebutting the evidence of his insanity defense. See R.C. 2945.10(D); *State v. Cooper* (1977), 52 Ohio St.2d 163, 173-174, 6 O.O.3d 377, 382-383, 370 N.E.2d 725, 732-733. This proposition is without merit.

12

E

Photographs

**{¶ 51}** In proposition No. VIII, Awkal contends that the autopsy photographs of the victims were improperly admitted during both the guilt phase and the penalty phase of his trial and that this admission requires reversal in this case. This proposition is without merit.

**{¶ 52}** The prosecution introduced twelve autopsy photographs of the two victims (six per victim). Appellant objected only to State Ex. 7, a photograph of Mahmoud with his eyes partially open. Thus, with the exception of State Ex. 7, the other photographs are reviewed on the basis of plain error.

**{¶ 53}** Under Evid.R. 403 and 611(A), the admission of photographic evidence is left to the discretion of the trial court. *State v. Maurer* (1984), 15 Ohio St.3d 239, 264, 15 OBR 379, 401, 473 N.E.2d 768, 791; *State v. Morales* (1987), 32 Ohio St.3d 252, 257, 513 N.E.2d 267, 273. Relevant, non-repetitive photographs, even if gruesome, are admissible if the probative value of each photograph exceeds the prejudicial impact to the accused. *Maurer, supra*, paragraph seven of the syllabus; *Morales, supra*, 32 Ohio St.3d at 257. The photograph in question shows Mahmoud's wounds and is not overly prejudicial.

**{¶ 54}** As to the remaining photographs, sheer numbers alone do not establish prejudice or show that the photographs are cumulative or repetitious. *State v. DePew* (1988)*,* 38 Ohio St.3d 275, 281, 528 N.E.2d 542, 550; *State v. Allen* (1995), 73 Ohio St.3d 626, 636, 653 N.E.2d 675, 686. See *State v. Lundgren*, 73 Ohio St.3d at 486, 653 N.E.2d at 318. Moreover, photographs may be admitted during the penalty phase of the trial. See *State v. DePew*, 38 Ohio st.3d at 282-283, 528 N.E.2d at 551-552.

**{¶ 55}** Awkal suffered no prejudice from the admission of these pictures. The victims died from multiple gunshot wounds. The autopsy photographs were introduced to illustrate the coroner's testimony and provide differing perspectives

of the victims and their numerous wounds. Thus, several photographs of each victim were necessary in order to show all of the entry and exit wounds. The photographs in this case are neither repetitive nor cumulative in number, and are non-prejudicial. Although it is possible to argue that fewer photographs could have been used, the trial court did not err in admitting these particular pictures.

II

Jury Instructions

{¶ 56} Appellant argues, in proposition Nos. IX and X, that the trial court erred when it instructed the jury during the guilt phase. In proposition No. IX, Awkal contends that the trial court committed plain error when it failed to instruct the jury that it need not unanimously find that Awkal was not guilty of aggravated murder before it considered the lesser offense of murder.

{¶ 57} Awkal did not object to the proposed instructions at trial and has waived this asserted error unless he would have been acquitted but for the error. *State v. Waddy* (1992), 63 Ohio St.3d 424, 437, 588 N.E.2d 819, 830. The court instructed on the applicable lesser included offenses, but failed to give any instruction regarding when the jury should proceed from deliberating on the primary charge to deliberating on the lesser included offense.

{¶ 58} Failing to instruct on this issue was error. The only instruction potentially applicable to this issue was when the court stated that the jury had not "reached a verdict" until all of the members of the jury agreed on the verdict. This instruction implies that jury unanimity is required on a not guilty verdict on the primary offense before the jury could move on to consider the lesser included offense. Thus, the trial court may have improperly required a unanimous not guilty verdict before considering the lesser included offenses. However, given the evidence of appellant's guilt below, this error did not rise to the level of plain error.

{¶ 59} In proposition No. X, Awkal attacks the trial court's jury instruction on "reasonable doubt." The trial court used the statutory definition of "reasonable

14

doubt" set forth in R.C. 2901.05(D). We have upheld use of that statutory language. See *State v. Jenkins* (1984), 15 Ohio St.3d 164, 15 OBR 311, 473 N.E.2d 264, paragraph eight of the syllabus; *State v. Frazier* (1995), 73 Ohio St.3d 323, 330, 653 N.E.2d 1000, 1008. This proposition is without merit.

{¶ 60} In proposition Nos. XII and XIII, Awkal contends the trial court improperly instructed the jury during the penalty phase. In proposition No. XII, Awkal argues that the court should have instructed the jury before the penalty phase began regarding what its function was during that phase of the trial and what the mitigating factors are, so that the jury would be informed what to expect when listening to the evidence, and that failing to instruct the jury permitted it to consider non-statutory aggravating circumstances. This argument is without merit.

{¶ 61} The trial court instructed the jury at the close of the evidence in the penalty phase. These instructions delineated the mitigating factors, the aggravating circumstances, and what the jury's function was. The court also instructed the jury that it was not limited to the statutory mitigating factors when weighing the mitigating factors against the aggravating circumstances. The record does not reflect that the jury was permitted to use non-statutory aggravating circumstances in its weighing process. This proposition is without merit.

{¶ 62} In proposition No. XIII, Awkal argues that the trial court committed plain error when it instructed the jury that it could consider Awkal's psychological evidence mitigating only if Awkal established that he lacked substantial capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law. This proposition has merit.

{¶ 63} Although the court instructed the jury that it was not limited to the statutory mitigating factors when weighing the mitigating factors against the aggravating circumstances, the court did not instruct the jury that it could use the psychological evidence for any purpose other than establishing the statutory mitigating factor in R.C. 2929.04(B)(3). Thus, the court failed to instruct the jury

that even if the jury determined that this mitigating factor was not established, it could view appellant's psychological evidence as mitigating under R.C. 2929.04(B)(7). This was error. See *State v. Seiber* (1990), 56 Ohio St.3d 4, 9 564 N.E.2d 408, 416. However, this error can be cured by our independent assessment. See *State v. Lott* (1990), 51 Ohio St.3d 160, 170, 555 N.E.2d 293, 304; *State v. Landrum* (1990), 53 Ohio St.3d 107, 110, 559 N.E.2d 710, 716.

III

Prosecutorial Misconduct

{¶ 64} In proposition of law No. VI, Awkal argues that the trial court committed plain error when it permitted the prosecutor to cross-examine Dr. McGee on the issue of Awkal's sanity at the time of the trial. Awkal also contends that the prosecutor's argument that Awkal would "walk out that door" if the jury found him not guilty by reason of insanity was error.

{¶ 65} Awkal objected to neither of these alleged errors at trial. Therefore, he has, with the exception of plain error, waived the issues. *Waddy, supra*, 63 Ohio St.3d at 437, 588 N.E.2d at 830.

{¶ 66} The admission of the evidence gained from the prosecution's cross-examination of Dr. McGee. was not error. However, even if it were error, given the evidence against him, the error was harmless. *Lundgren, supra*, 73 Ohio St.3d at 485.

{¶ 67} It was error for the prosecutor to argue that Awkal would "walk out that door" if the jury found him not guilty by reason of insanity. First, this statement was an incorrect statement of the law. If Awkal were found not guilty by reason of insanity, he would have been confined to a psychiatric facility until his sanity was restored. This statement plainly sought to inflame the passions of the jury. However, the prosecutor's arguments, as a whole, although impassioned, did not deprive Awkal of a fair trial and did not constitute plain error. *Maurer, supra*, 15

Ohio St.3d at 266 15 OBR at 402, 473 N.E.2d at 793. Accordingly, this proposition is without merit.

IV

Lack of Remorse

{¶ 68} In proposition No. XI, Awkal contends the trial court committed plain error when it permitted the prosecutor to argue that Awkal demonstrated no remorse for his actions. Awkal contends that these statements might have been based on Awkal's failure to show emotion during the trial, and that they impugned his right not to testify against himself. This proposition is without merit.

{¶ 69} The prosecutor's first comment does not discuss Awkal's lack of remorse:

"And then you'll find a common theme, ladies and gentlemen, of placing blame, placing the blame for his predicament on his wife, Latife, and his brother-in-law Mahmoud. Blame them, blame his family, blame religion. The guy goes up there and he gives an unsworn statement, at any point does he accept responsibility for what he did? It's not my fault, blame them."

{¶ 70} However, the prosecutor's later comments do address the remorse issue:

"[D]id he ever accept responsibility for what he did? Did he ever even remotely *at the time of the murder* even indicate that he was sorry? Is that asking too much? The man's still angry." (Emphasis added.)

{¶ 71} However, these comments were not error. The prosecutor is addressing Awkal's statements at the time of the event, not his decision not to testify at trial. The prosecutor was entitled to rebut the evidence of remorse presented by Awkal. Further, appellant's counsel did not object to this argument at trial. A prosecutor's actions at trial do not create ground for error unless they deprive a defendant of a fair trial. *Maurer, supra,* 15 Ohio St.3d at 266, 15 OBR at

402, 473 N.E.2d at 793.  Awkal was not deprived of a fair trial by this statement. This proposition is without merit.

V

Ineffective Assistance of Counsel

**{¶ 72}** Awkal contends, in his proposition of law No. III, that his trial counsel was ineffective because it presented an insanity defense with three incompetent "expert witnesses."  Awkal's argument is without merit.

**{¶ 73}** To demonstrate that counsel was ineffective, Awkal must prove that counsel's performance was deficient and that this prejudiced him.  *Strickland v. Washington* (1984), 466 U.S. 668, 687, 100 S.Ct 2052, 2064, 80 L.Ed.2d at 674, 693; *State v. Bradley* (1989), 42 Ohio St.3d 136, 538 N.E.2d 373, paragraph two of the syllabus.

**{¶ 74}** Awkal was not deprived of a fair trial by his trial counsel.  Given the evidence supporting his conviction, he was not prejudiced by what occurred at trial.

**{¶ 75}** Counsel called Dr. Hewitt as an expert witness to testify during the guilt phase on the issue of prior calculation and design.  While attempting to qualify Dr. Hewitt to give an opinion on that issue, counsel established that Dr. Hewitt was not competent to engage in forensic psychology.  During a discussion in chambers, the court learned that Dr. Hewitt was not a licensed psychologist in Ohio and struck Dr. Hewitt's testimony.  Trial counsel knew of Dr. Hewitt's lack of qualifications before he called Dr. Hewitt to the stand.  Counsel made a tactical decision to try to get Dr. Hewitt's testimony into evidence.  He failed.  This was not a good tactical decision, but it does not rise to the level of ineffective assistance of counsel.

**{¶ 76}** Counsel also called Dr. Rizk to testify during the guilt phase.  Dr. Rizk is adequately qualified and has testified in numerous other similar circumstances.  However, Dr. Rizk testified that Awkal was sane at the time of the murders.  This testimony obviously damaged Awkal's affirmative defense that he was not sane when he committed the murders.  Yet, portions of Dr. Rizk's

testimony assisted the defense, including testimony about religion as a basis for Awkal's marital problems, his medication levels, and his hallucinations.

{¶ 77} Counsel concluded Awkal's affirmative defense by calling Dr. McGee, a psychiatrist. Dr. McGee was not yet board certified in psychiatry, had no experience in forensic psychiatry, and had been practicing psychiatry for only one year. Dr. McGee testified that Awkal, as evidenced by his hallucinations involving his wife in his cell in Dayton, had broken with reality at the time of the murders. This break with reality impaired his ability to know right from wrong at the time of the murders. Although her opinion may have been diminished by her lack of certification and inexperience, Dr. McGee supported Awkal's affirmative defense.

{¶ 78} Thus, of the three doctors called to testify for the defense, the testimony of one was stricken from the record, one gave an opinion contradicting Awkal's affirmative defense but also gave other evidence that assisted that defense, and one testified that Awkal was not mentally responsible for his acts. However, Drs. McGee and Hewitt were called to testify and did testify during the penalty phase of the trial, giving pro-defense opinions. Dr. Samy also gave a pro-defense opinion in the penalty phase.

{¶ 79} Awkal's counsel obviously had some plan in mind. Dr. Hewitt conceivably could have been allowed to testify as an expert witness, and Dr. Rizk did make an earlier finding that Awkal was incompetent to stand trial. In hindsight it appears that Awkal may have been better served to call only Dr. McGee during the guilt phase, and call her and the other defense doctors during the penalty phase, if the trial would reach that stage. However, the end result of tactical trial decisions need not be positive in order for counsel to be considered "effective." See *State v. Lawson* (1992), 64 Ohio St.3d 336, 341, 595 N.E.2d 902, 907. We do not believe the record establishes that Awkal's attorneys were ineffective at trial.

VI

Eighth Amendment/Proportionality

{¶ 80} In proposition No. XIV(A)-(M), Awkal challenges the constitutionality of Ohio's death penalty statute. These claims were previously rejected in *State v. Steffen* (1987)*,* 31 Ohio St.3d 111, 125, 31 OBR 273, 285-286, 509 N.E.2d 383, 396; *State v. Beuke* (1988), 38 Ohio St.3d 29, 38-39, 526 N.E.2d 274, 285*; State v. Mills* (1992), 62 Ohio St.3d 357, 371-372, 582 N.E.2d 972, 985-986. We will not revisit them in this case.

VII

Independent Sentence Assessment

{¶ 81} After independent assessment, we find that the evidence proves the aggravating circumstances for which Awkal was convicted, namely multiple murder, beyond a reasonable doubt. The record also establishes that the aggravating circumstances outweigh the combined mitigating factors beyond a reasonable doubt.

{¶ 82} The nature and circumstances surrounding the offense are not mitigating. Awkal acted in a cold, calculating fashion. He threatened Latife and her family before the murder. He then prepared himself, his car, and his personal effects for the events that would follow. After this preparation, Awkal went to the basement of the courthouse and calmly, repeatedly shot and killed his wife and her brother at close range. Then, in an attempt to escape these killings, he pointed his loaded gun at his daughter's head and threatened to kill her.

{¶ 83} Awkal's character, history and background are mitigating. Awkal's childhood was poor. He grew up in Beirut, Lebanon, and was forced to quit school in the fourth grade to help his father's business. His father was physically abusive, on one occasion beating Awkal to the point of unconsciousness. Although poorly educated, Awkal learned to speak English when he arrived in this country. Further, he was gainfully employed, holding two jobs, as a gas station attendant and automobile plant employee. He also tried to raise a family.

**{¶ 84}** Awkal's claim of remorse is relevant. Awkal's expert witnesses testified that the victims "induced" and "facilitated" the offense within the meaning of R.C. 2929.04(B)(1). Awkal gave an unsworn statement, in which he discussed his religious differences with Latife and her brother as the source of his marital problems. He also accused Mahmoud and his brothers of threatening him and interfering with his family. Further, Awkal's experts offered supporting testimony that he acted "under duress, coercion, or strong provocation." R.C. 2929.04(B)(2).

**{¶ 85}** Awkal presented evidence under R.C. 2929.04(B)(3) that he suffers from major depression, a mood disorder. Awkal's psychological experts believed that he suffered from this disorder for some time before the murders. These experts testified that he did not know right from wrong or understand the criminality of his actions at the time of the murders. Thus, Awkal presented evidence that he lacked substantial capacity to appreciate the criminality of his acts or to conform his conduct to the requirements of the law. R.C. 2929.04(B)(3).

**{¶ 86}** However, the prosecution rebutted this psychological evidence with the testimony of Dr. Dutton. Dr. Dutton testified that Awkal was malingering and that he acted out of anger and knew the criminality of his actions. We concur. By his actions and preparations that day, Awkal demonstrated that he knew what he was doing and that what he was doing was wrong. This is evidenced by his pre-shooting preparations, including changing his address at the post office and preparing his car with the baby's medical records, baby food, and child care products, and his post-shooting actions, including trying to escape by using the baby as a shield and threatening to kill her. Although we find that appellant did not establish that he lacked the capacity to appreciate the criminality of his actions or to conform his conduct to he requirements of the law, his history of mental problems and his current mental condition are entitled to some weight as mitigation under R.C. 2929.04(B)(7).

**{¶ 87}** Awkal's age, thirty-two at the time of the offenses, does not mitigate this crime. R.C. 2929.04(B)(4). Awkal has no prior criminal history. Thus, R.C. 2929.04(B)(5) is relevant in mitigation. Awkal was the principal actor. Hence, R.C. 2929.04(B)(6) is inapplicable.

**{¶ 88}** The aggravating circumstances outweigh the mitigating circumstances in this case. The evidence shows that these murders were not the insane acts of a madman, but were the methodical acts of an angry and vengeful man. Awkal bought a gun and then threatened his wife and her family before the murders. He changed his address, obtained a place to live in Michigan, wrote a check to his brother for nearly the entire contents of the family's bank accounts, and obtained his baby's medical records as preparation for the events that would follow. After this preparation, Awkal loaded his gun and, with an extra magazine, went into a public courthouse and calmly, repeatedly shot and killed his wife and her brother at close range in front of several witnesses. Then, in an attempt to escape, he pointed his loaded gun at his daughter's head and threatened to kill her and himself.

**{¶ 89}** Awkal prepared himself for murder and a getaway. He appreciated that his actions were wrong and attempted to use his daughter as a human shield when his plans went awry. Thus, the specified aggravating circumstances outweigh the collective mitigation evidence beyond a reasonable doubt. Therefore, the death penalty is appropriate.

**{¶ 90}** The death penalty in this case is not excessive when compared with the penalty imposed in other multiple-murder cases involving a mental disease issue. See, *State v. Seiber,* 56 Ohio St.3d 4; 564 N.E.2d 408; *State v. Garner* (1995), 74 Ohio St.3d 49, 656 N.E.2d 623.

**{¶ 91}** Accordingly, we affirm appellant's convictions and his sentence of death.

*Judgment affirmed.*

MOYER, C.J., DOULGAS, LAZARUS, RESNICK, F.E.SWEENEY and COOK, JJ., concur.

CYNTHIA CECIL LAZARUS, J., of the Tenth Appellate District, sitting for WRIGHT, J.

————————————