OPINION
{¶ 1} Plaintiffs-appellants Bernard Blansett et al. ("appellants") bring this appeal from the judgment of the Court of Common Pleas of Allen County in favor of defendant-appellee BP Exploration Oil, Inc. ("BP").
{¶ 2} In October of 1994, appellants were employed as independent contractors to participate in a turnaround[1] at BP. Their part in the turnaround was to clean the heat exchangers. At no point were the appellants ever employed by BP. In the early morning hours of October 7, 1994, an unidentified liquid came out of the benzene vent scrubber and rained down on everyone in the area. As a result of this incident, all work in the vicinity was stopped until the situation could be evaluated. Appellants were removed from the area. Eventually, appellants were sent back to work. No other exceptional incidents occurred during the turnaround.
{¶ 3} During the turnaround, appellants were involved in pulling heat exchangers out of the various pipes. The heat exchangers were then transported to a cement slab where appellants unloaded them from the truck and a third company used high pressure water to blast any debris from the exchangers. Appellants continued at BP until the end of October 1994.
{¶ 4} On October 3, 1996, appellants filed a complaint in the trial court alleging exposure to toxic chemicals. After several years of procedure, including a motion for summary judgment by BP which was denied, this case went to a jury trial on February 7, 2000. Appellants presented the evidence of a BP employee testifying as to the various possible causes of the rain incident. Appellants then presented the testimony of a refinery expert to explain how he believed the rain incident occurred and how the chemicals could remain in the pipes after steaming and be flushed out during the high pressure cleaning. Next, appellants presented the testimony of various medical experts including general practitioners, a urologist, psychologists, psychiatrists, and occupational therapists. These doctors all testified to the various ailments of the appellants, the tests conducted, the treatments tried, the prognosis for recovery, and the cause, as they believed it to be, for the ailments. The appellants and their family members also testified as to what happened at the refinery, the effects the alleged chemical exposure had on their physical and mental health, and on their relationships with others.
{¶ 5} Once appellants rested, BP presented the testimony of various employees as to what occurred during the turnaround. BP then presented the testimony of its own refinery expert who explained how, in his opinion, the appellants could not have been exposed to a harmful level of chemicals during their time at BP. BP then presented the testimony of its own medical expert who had examined the appellants and determined that there was no connection between appellants' time at BP and their claimed medical conditions. On March 14, 2000, the jury returned a verdict in favor of BP. Appellants raise the following assignments of error.
 {¶ 6} "The trial court erred submitting jury interrogatory #1 in the following respects:
 {¶ 7} "It asked whether appellants had been exposed to "a harmful level of toxic chemicals at the Lima Refinery.
 {¶ 8} "It directed the jury to the general verdict form in favor of BP in the event the jury found no "harmful" level of toxic exposure.
 {¶ 9} "It did not address issues that were ultimate or determinative in character.
 {¶ 10} "It directed the jury to the general verdict form in favor of BP before the jury gave due consideration to whether or not appellants had suffered physical injuries as a result of exposure to chemicals at BP.
 {¶ 11} "It directed the jury to the general verdict form in favor of BP before the jury gave due consideration to whether or not appellants suffered emotional injury as a result of their exposure to substances at BP.
 {¶ 12} "The trial court erred in its refusal to allow appellants to recall their refinery liability expert to testify about appellants' quantitative levels of chemical exposure [when] appellants' counsel, during trial, discovered Ohio Environmental Protection Agency documents — not produced by BP — that indicated much higher quantities of toxic substances in refinery liquids than previously acknowledged, documented, or disclosed by BP.
 {¶ 13} "The trial court erred in its refusal to disallow or strike the testimony of BP's neuropsychological expert, Dr. Paul Lees-Haley. The trial court did not require proof of the scientific validity, acceptance, or reliability of psychological and neuropsychological testing instruments relied on by Dr. Lees-Haley.
 {¶ 14} "The trial court erred when it refused to conduct a hearing and make inquiry into alleged juror irregularities including:
 {¶ 15} "Remarks that a juror or jurors had already made up his/her/their minds about the case, and
 {¶ 16} "Prior employment at BP by a relative of juror Ruth Hammer."
{¶ 17} BP raises the following assignments of error on cross-appeal.
 {¶ 18} "The trial court erred in denying BP's summary judgment motion where appellants did not present sufficient evidence of exposure to harmful levels of any toxic substances.
 {¶ 19} "The trial court erred in refusing to exclude expert testimony offered by appellants, which was unreliable under Evid.R. 702 and failed to meet the standards of Miller v. Bike Athletic Co. (1998), 80 Ohio St.3d 607."
{¶ 20} In its cross-appeal, BP claims that the trial court erred in denying its motion for summary judgment. BP claims that appellants did not provide sufficient evidence of toxic exposure. When reviewing a motion for summary judgment, courts must proceed cautiously and award summary judgment only when appropriate. Franks v. The Lima News (1996),109 Ohio App.3d 408. "Civ.R. 56(C) provides that before summary judgment may be granted, it must be determined that (1) no genuine issue as to any material fact remains to be litigated; (2) the moving party is entitled to judgment as a matter of law; and (3) it appears from the evidence that reasonable minds can come to but one conclusion, and viewing the evidence most strongly in favor of the nonmoving party, that conclusion is adverse to the nonmoving party." State ex rel. Howard v. Ferreri (1994),70 Ohio St.3d 587, 589. However, the nonmoving party must present evidence on any issue for which it bears the burden of production at trial. Wing v. Anchor Media, Ltd. of Texas (1991), 59 Ohio St.3d 108. When reviewing the judgment of the trial court, an appellate court reviews the case de novo. Franks, supra.
{¶ 21} In this case, the trial court, as well as this court, reviewed voluminous amounts of evidence before ruling on the motion for summary judgment. This evidence included various depositions by BP employees, appellants, and numerous medical professionals. The testimony given in these depositions established that several debates existed as to what happened, what BP's responsibility was, and what the actual injury, if any, was. These are all issues of fact for a jury to decide. Reviewing this evidence in a light most favorable to appellants, the denial of summary judgment was appropriate. Thus, BP's first assignment of error is overruled.
{¶ 22} BP's second assignment of error and appellants' third assignment of error both deal with the admission of expert testimony. Specifically, BP claims that the testimony of four of appellants' experts should have been excluded. Appellants claim that the testimony of Dr. Paul Lees-Haley should have been excluded.
 {¶ 23} "A witness may testify as an expert if all of the following apply:
 {¶ 24} "(A) The witness' testimony either relates to matters beyond the knowledge or experience possessed by lay persons or dispels a misconception common among lay persons;
 {¶ 25} "(B) The witness is qualified as an expert by specialized knowledge, skill, experience, training, or education regarding the subject matter of the testimony.
 {¶ 26} "(C) The witness' testimony is based on reliable scientific, technical, or other specialized information. To the extent that the testimony reports the result of a procedure, test, or experiment, the testimony is reliable only if all of the following apply:
 {¶ 27} "(1) The theory upon which the procedure, test, or experiment is based is objectively verifiable or is validly derived from widely accepted knowledge, facts, or principles;
 {¶ 28} "(2) The design of the procedure, test, or experiment reliably implements the theory;
 {¶ 29} "(3) The particular procedure, test, or experiment was conducted in a way that will yield an accurate result." Evid.R. 702.
 {¶ 30} "The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by him or admitted in evidence at the hearing." Evid.R. 703. The testimony of an expert is admissible if the trial court determines that it is reliable and relevant to the task at hand. Miller v. Bike Athletic Co. (1998), 80 Ohio St.3d 607 (citing Daubert v. Merrell Dow Pharmaceuticals, Inc. (1993), 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469.)
 {¶ 31} "In evaluating the reliability of scientific evidence, several factors are to be considered: (1) whether the theory or technique has been tested, (2) whether it has been subjected to peer review, (3) whether there is a known or potential rate of error, and (4) whether the methodology has gained general acceptance. * * * Although these factors may aid in determining reliability, the inquiry is flexible. * * * The focus is `solely on principles and methodology, not on the conclusions that they generate.'" Id. at 611-12. "Determinations of expert witness qualifications to testify are within the discretion of the trial court." State v. Awkal (1996), 76 Ohio St.3d 324, 331. Thus, any questions concerning the admission of expert testimony is reviewed under an abuse of discretion standard. Id.
{¶ 32} Appellants claim that the testimony of Dr. Paul Lees-Haley should have been excluded because some of the tests he used to determine that appellants were malingering have been scientifically discredited. Dr. Lees-Haley testified that he used a large variety of tests to provide for checks and cross-checks of the results. The trial court addressed appellants' objection as follows.
{¶ 33} "The Court finds that there's no question that Dr. Paul Lees Haley is a qualified expert based upon his training and experience. And the Court's not going to go into all the Miller, Bike, and Daubert,
but, the Court has analyzed that in the same fashion it has done so in the other experts that have testified. And has considered the expert testimony as to whether its (sic) reliable and relevant to the task at hand.
{¶ 34} "First of all, whether the theory or technique has been tested. The Court finds that his research methodology are various tests run to test the credibility of other tests, cross checking, attempt to find the norm, the brain tests, emotional tests.
{¶ 35} "The Court would find that these are the same or similar tests that were run by other experts for the Plaintiff and on the potential rate of error there's checks and balances, they discuss the highs and lows, again, similar to the expert of the Plaintiffs in this regard.
{¶ 36} "The Court finds that the methodology has gained general acceptance in the psychology field. The tests that were run, the Court finds, are tests standard and accepted in the field. The Court finds that there may be differences of opinion because there's (sic) premises as to whether there was an exposure or not an exposure. But that goes to — and his tests and whether they — as Mr. Weaver indicated, that those matters are argument for the jury. It goes to credibility and not to admissibility.
{¶ 37} "Therefore, the Court finds in this particular instance that the testimony of Dr. Lees Haley could aid the trier of fact in determining the material fact in this case as testified to by Dr. Lees Haley. And the trier of fact will have an opportunity to weigh that opinion against the Plaintiffs' experts." Tr. Vol. 20, 170-71.
{¶ 38} Since the trial court's opinion is supported by the testimony of Dr. Lees-Haley and the fact that several of the other expert witnesses used many of the same tests, we do not find that the trial court abused its discretion in permitting the testimony of Dr. Lees-Haley. Thus, appellants' third assignment of error is overruled.
{¶ 39} On its cross-appeal, BP challenges the admissibility of four of appellants' expert witnesses. Before ruling on BP's challenge, the trial court made the following statements.
{¶ 40} "One of [BP's] main arguments during the trial and also during the arguments in their Motion to Strike as unreliable is that, well, all you have is the quantitative report. Of course, that was taken eight hours afterwards. And you can't prove the exact amount or the exact substance.
{¶ 41} "And i.e. therefore, the experts can't testify because you can't find a pea under the thimble, so to speak. This Court doesn't believe that's the way our judicial system works. Sometime when there's no direct evidence, circumstantial and reasonable inferences are acceptable. Especially if there is no direct evidence. Especially in the year 2000 with all the developments in medical science and the things that are happening. We are not in the dark ages.
{¶ 42} "There may be many issues as to credibility, but just because one side doesn't like the conclusion doesn't necessarily mean the person's testimony should be striken.
{¶ 43} "The experts who have testified are John Whitman, who is a chemical engineer and consulting engineer; Dr. Jerrold Leikin, Board Certified in Internal Medicine, ER, Medical Toxicology; Charles Secrest, a Urologist, specialist in erectile dysfunction; McKinley Lundy, doctor of osteopathic, emphasis on primary care; Dr. John Wilson, psychologist and his gold, gilded credentials; Dr. David Hartman, clinical neuropsychology, behavioral toxicologist, doctor at neuropsychological assessment; Dr. John Burke, an economist, has Masters and Doctorate Degree; Charlton Stanley, a psychologist; Dr. Mark Webb, psychiatrist, Board Certified.
{¶ 44} "The Court finds in deciding whether Plaintiffs' experts testimony should be admitted, the Court, again, must begin its analysis with consideration of Evidence Rule 702, which governs the admissibility of expert testimony.
{¶ 45} "* * *
{¶ 46} "From the status of the testimony the Court finds that there are no questions that the Plaintiff's experts are qualified experts who testified about a subject beyond the knowledge of lay persons, Evidence Rule 702(A) (B).
{¶ 47} "Thus, at issue in this case is whether Plaintiffs' experts testimony complies with the requirements of Evidence 702(C). In other words, whether their opinions are reliable.
{¶ 48} "In making this determination, the Court's inquiry focuses upon the principles and methods of the Plaintiffs' experts employed to reach their opinion or whether they are reliable. Not whether their conclusions are correct.
{¶ 49} "* * *
{¶ 50} "Conflicting views brings the issue of credibility into play. However, even if Plaintiff experts opinions (sic) have neither gained general acceptance by the scientific or medical community nor have been the subject of peer review these are not prerequisites to admissibility as set forth in Daubert." Tr. Vol. 14, 14-18.
{¶ 51} The first expert challenged by BP was John Whitman ("Whitman"), who was an expert in the operations of oil refineries. BP claims that Whitman's testimony was based on speculation because Whitman's testimony was not based on "what actually happened" at the refinery.[2] Whitman testified that he was a chemical engineer who had extensive experience working with oil refineries, though not the one in Lima. Whitman testified about the normal operations and turn-a-round procedures. The basis for his opinions was his personal knowledge of refinery procedures, the depositions of various BP employees, BP schematics of the Lima refinery, and various documents, including manuals, provided by BP. Based upon this testimony, the trial court determined that Whitman was qualified as an expert and that his testimony was relevant to the matter before the court. The trial court also determined that Whitman's testimony could aid the jury in determining whether BP failed to properly maintain and control its refinery operation during the rain incident, which was an alleged cause of the injuries claimed. For these reasons, the trial court overruled the motion to strike Whitman's testimony. Since the evidence supports the trial court's findings, it did not abuse its discretion in denying the motion.
{¶ 52} Next BP moved to strike the testimony of Dr. Gerald Leikin ("Leikin"). BP claims that Leikin's testimony should have been stricken because he never personally met with or examined any of the appellants. Instead, Leikin reviewed all of the medical reports of other physicians, the test results and the deposition testimony of appellants. Many of the medical reports were admitted into evidence at trial. Both appellants and the experts who ordered the tests testified as to the tests given and the results of those tests. Appellants testified at trial to the same testimony that was given in the depositions. Thus, the evidence upon which Leikin relied was admitted into evidence at trial, which is a permissible basis for expert opinion pursuant to Evid.R. 703. In addition, the fact that Leikin had not personally examined the appellants went to the weight of the testimony, not to its admissibility and was addressed on cross-examination by BP. Thus, the trial court did not err by admitting the testimony.
{¶ 53} BP's third motion to strike addressed the testimony of David Hartman ("Hartman"), an expert in neuropsychology. The basis of BP's argument is that Dr. Hartman is not a medical doctor nor a toxicologist and was thus not competent to give an opinion about the medical or toxicological causes of any neuropsychological problems. A review of the testimony reveals that Hartman has a doctorate degree in neuropsychological assessment and has written books on how different chemicals affect the brain. He also testified that he frequently gets referrals from various doctors to determine whether a patient is suffering from exposure to various chemicals. He testified that through his practice, he has learned to recognize the effects of various chemicals on the brain. His theories have been subjected to various peer reviews and are deemed generally accepted. The method of determining brain damage was to use various psychological tests that are generally accepted as scientifically valid. Based upon his testimony, both on direct and cross-examination, the trial court determined that the basis of his theories and methodology was sufficiently reliable to permit him to testify. Although he is not a medical doctor or a toxicologist, he has been working in the area of neuropsychology for approximately 20 years. Thus, the trial court determined that the lack of medical degree goes to the weight of the evidence, not its admissibility. This is not an abuse of discretion.
{¶ 54} Finally, BP challenges the testimony of John Wilson ("Wilson"), a forensic psychologist who claimed that the appellants suffered from Post-Traumatic Stress Disorder ("PTSD"). The basis of its objection is that there is inadequate testing for the existence of PTSD among individuals exposed to toxic chemicals. The trial court found that although the number of individuals found to be suffering from PTSD due to toxic exposure was not sufficient to form a database, there were other tests that formed the basis of Wilson's opinions. Wilson testified to four tests used to confirm the existence of PTSD and to cross-check the validity of the others. Wilson's method of testing had been subjected to peer reviews and he had been involved with approximately 40 articles on the topic. The trial court also determined that Wilson had written numerous books on the topic. Since there was other reliable basis for the opinions besides a database, the trial court found that Wilson had presented sufficient evidence to support the reliability of his theory and that the testimony was helpful to the jury. Thus, the trial court overruled the motion to strike. This ruling was not an abuse of discretion. Since the trial court did not abuse its discretion in ruling on the motions to strike, the second assignment of error raised in the cross-appeal is overruled.
{¶ 55} In the first assignment of error, appellants claim that the first jury interrogatory was improperly drafted. The function of jury interrogatories is to "test the correctness of a general verdict by eliciting from the jury its assessment of the determinative issues presented by a given controversy in the context of evidence presented at trial." Cincinnati Riverfront Coliseum, Inc. v. McNulty Co. (1986),28 Ohio St.3d 333, 337. "Proper jury interrogatories must address determinative issues and must be based upon the evidence presented."Ramage v. Cent. Ohio Emergency Serv., Inc. (1992), 64 Ohio St.3d 97. Determinative issues are defined as "ultimate issues which when decided will definitely settle the entire controversy between or among the parties, so as to leave nothing for the court to do but to enter judgment for the party or parties in whose favor such determinative issues have been resolved by the jury." Miller v. McAllister (1959), 169 Ohio St. 487,494.
{¶ 56} Here, appellants claim that the interrogatory was invalid for several reasons. The first reason is that it asked whether appellants had been exposed to a harmful level of toxic chemicals. Appellants claim that the interrogatory should have just asked whether appellants were exposed to toxic chemicals rather than a harmful level. We note that appellants did not specifically object to the inclusion of the harmful level language at trial. Instead, appellants stated as follows:
 {¶ 57} "Mr. Shockey: We — our concerns with question No. 1 of the special interrogatories are that the three central issues in the case are negligence, proximate cause, and damages. And that exposure to particular chemicals is not a requirement. And we note that for the record." Tr. Vol. 21, 46.
{¶ 58} With negligence or intentional tort claims resulting from exposure to toxic chemicals, the plaintiff must show that he or she was exposed to the toxic substance and that it was the proximate cause of the injury. Horton v. Harwick Chem. Corp. (1995), 73 Ohio St.3d 679. In order to be injured, the party must, obviously, have been exposed to enough of the substance to cause harm. What amount causes harm is a question of fact for the jury to determine. Here, appellants claim that the trial court erred by drafting the interrogatory to ask the jury if appellants had been exposed to a harmful level of toxic chemicals. The jury's answer to this question was no. The result was that the jury determined that there was no exposure, so the exposure to toxic chemicals could not be the cause of appellants' injuries. Since causation is an element of a negligence claim, the interrogatory was determinative in character and was appropriate.
{¶ 59} Appellants also claim that interrogatory number one was incorrect because it directed the jury to the general verdict form before it considered physical and emotional injuries as a result of the exposure. However, all damages claimed in the complaint arise from the claim that BP was negligent in exposing them to toxic chemicals which caused these injuries. Without a finding of exposure, there can be no causation of injury. Thus, the jury did not need to address the questions of damages that may have resulted from the exposure. Therefore, we find no error in the interrogatories as presented. Appellants' first assignment of error is overruled.
{¶ 60} Appellants claim in the third assignment of error that the trial court erred in not permitting them to recall their refinery liability expert. The issue arose when appellants located an EPA document from 1993 and wished to use it at trial. The trial court ruled that the document was relevant and that Appellants could use the document to cross-examine BP's witnesses. However, the trial court ruled that there was no reason to recall appellants' expert witness at that time. The decision to admit evidence and to permit the testimony of expert witnesses is within the sound discretion of the trial court. State v.Robb (2000), 88 Ohio St.3d 59. In this case, appellants did not proffer or ever ask to proffer the expected testimony of the expert. Without this proffer of testimony, we cannot determine whether the exclusion of the testimony was prejudicial. Combs v. Cincinnati Gas Electric Co. (1984), 16 Ohio App.3d 98.
{¶ 61} However, there is no evidence that permitting the expert to re-testify would have had any benefit to appellants. In fact, appellants were not even sure that they would recall the expert if permitted because the expert had not reviewed the EPA document yet and thus it was unknown whether the document would be helpful to their case. Given the facts before it when it ruled, the trial court did not abuse its discretion in denying appellants the right to recall their expert at that time. The second assignment of error is overruled.
{¶ 62} In the fourth assignment of error, appellants claim that the trial court erred by not holding a hearing on alleged juror misconduct.
{¶ 63} "As a reviewing court, we show deference to the trial judge, who sees and hears the events and thus is in a better position to accurately evaluate the situation and determine the appropriate scope of inquiry. * * * Therefore, we employ an abuse-of-discretion standard and will not reverse the trial court unless it has handled the alleged juror misconduct or ruled upon the post-trial motion in an "unreasonable, arbitrary, or unconscionable" manner." State v. Hessler (2000),90 Ohio St.3d 108, 115-16.
{¶ 64} Here, appellants brought two alleged incidents of juror misconduct to the attention of the trial court. First, appellants raised the issue that a juror was overheard saying that he had already made up his mind before the evidence was all presented. The trial court then called the juror into the courtroom and questioned the juror about his position. The juror told the court that he had not made up his mind and would listen to all of the evidence before he did so. Appellants then wanted to question the remaining jurors to learn if they also may have already reached a decision. The trial court denied this request.
{¶ 65} Next, appellants brought the fact that a relative of one of the jurors had previously been employed by BP. However, this relative was no longer an employee of BP, so the trial court did not find this to be misconduct as the juror did not misrepresent her position when questioned whether she or any member of her family was currently employed by BP. Given the facts before it, we do not find that the trial court abused its discretion in refusing to continue the inquiry. Therefore, the fourth assignment of error is overruled.
{¶ 66} The judgment of the Court of Common Pleas of Allen County is affirmed.
Judgment affirmed.
BRYANT and HADLEY, JJ., concur.
[1] A turnaround is a regular period of shutdown during which refinery operations cease and the various pipelines and tanks in the refinery are drained, cleaned, inspected, and repaired if necessary.
[2] This argument seems somewhat disingenuous since the ultimate issue at trial was to determine what actually happened at the refinery during the time in question.