[Cite as *In re C.E*, 2010-Ohio-4410.]

**IN THE COURT OF APPEALS OF OHIO
THIRD APPELLATE DISTRICT
MARION COUNTY**

| | |
|---|---|
| **IN THE MATTER OF:** | **CASE NO. 9-10-32** |
| **C.E.** | |
| **ALLEGED DEPENDENT CHILD** **[SARAH ESCANDON, APPELLANT].** | **O P I N I O N** |

| | |
|---|---|
| **IN THE MATTER OF:** | **CASE NO. 9-10-33** |
| **E.E.** | |
| **ALLEGED DEPENDENT CHILD** **[SARAH ESCANDON, APPELLANT].** | **O P I N I O N** |

| | |
|---|---|
| **IN THE MATTER OF:** | **CASE NO. 9-10-34** |
| **G.E.** | |
| **ALLEGED DEPENDENT CHILD** **[SARAH ESCANDON, APPELLANT].** | **O P I N I O N** |

| | |
|---|---|
| **IN THE MATTER OF:** | **CASE NO. 9-10-35** |
| **P.E.** | |
| **ALLEGED DEPENDENT CHILD** **[SARAH ESCANDON, APPELLANT].** | **O P I N I O N** |

**IN THE MATTER OF:**                                  **CASE NO. 9-10-36**

**I.E.**

**ALLEGED DEPENDENT CHILD**                  **O P I N I O N**
**[SARAH ESCANDON, APPELLANT].**

**Appeals from Marion County Common Pleas Court**
**Trial Court Nos. 2007-AB-0075, 2007-AB-0078, 2007-AB-0079,**
**2007-AB-0076, 2007-AB-0077**

**Judgments Affirmed**

**Date of Decision:  September 20, 2010**

**APPEARANCES:**

 *Kevin P. Collins,* **for Appellant Sarah Escandon**

 *John A. Minter,* **for Appellee Marion County Children Services**

**SHAW, J.**

 **{¶1}**  Mother-appellant, Sarah Escandon ("Sarah"), appeals the April 21, 2010 judgments of the Common Pleas Court, Juvenile Division, of Marion County, Ohio, granting permanent custody of her five children, C.E., P.E., I.E.,

E.E., and G.E., to Marion County Children Services ("MCCS") and terminating her parental rights to these children.[1]

**{¶2}** The facts relevant to this appeal are as follows. On July 9, 2007, a complaint was filed in the Juvenile Court of Marion County, Ohio, alleging that C.E., who was six years old at the time, was an abused and dependent child. The complaint stated that MCCS obtained pictures of C.E. that showed him wearing makeup in one and a diaper on his head in another. According to the complaint, C.E. appeared visibly distressed in the photographs and had reported that his mother, Sarah, took the pictures and that his parents were making fun of him. The complaint also stated that Sarah admitted to shoving a sock in C.E.'s mouth in an effort to stop his crying. Based on these same allegations, four other complaints were filed that same day, alleging that each of the other children were dependent.

**{¶3}** MCCS submitted a case plan to the court, which was approved on August 3, 2007. That plan identified several concerns, including providing for the children's basic needs such as appropriate housing, proper medical and dental care, and regular school attendance. The plan also required that the parents obtain counseling and learn new disciplinary techniques through Marion Area Counseling Center and that they keep a journal of C.E.'s behaviors and their

---

[1] The father, Cruz Escandon, was not present at the permanent custody hearing because he was being held by federal authorities for deportation proceedings as he was an illegal immigrant from Mexico. Father did not appeal the grants of permanent custody.

responses to each behavior. MCCS was to provide assistance to the family through case counseling and case management.

**{¶4}** A hearing was held on these matters in August of 2007, and on October 9, 2007, all five children were adjudicated dependent and placed in the protective supervision of MCCS. However, on February 13, 2008, C.E. was removed from his parents' home and placed in foster care. The following day, MCCS filed an ex parte motion for emergency temporary custody of C.E. In this motion, MCCS alleged that C.E. had significant bruising on his arm from being hit by an electrical cord. The motion was granted, and C.E. was removed from his parents' home. A full hearing on this matter was conducted on March 18, 2008, MCCS was granted temporary custody of C.E., and an amended case plan was adopted.

**{¶5}** The amended case plan stated that the reason C.E. was removed from the home was due to him being struck by an electrical cord by Sarah. More specifically, the amended case plan indicated that both C.E. and his sister, P.E., reported to their caseworker that Sarah had struck C.E. with the extension cord but that they changed their story once they were home with Sarah, stating that P.E. struck C.E. with the cord. However, once C.E. was removed from the home, he once again told the caseworker that it was his mother, rather than P.E., who had struck him. In addition to the previously noted concerns and requirements of the case plan, this amendment included provisions that Sarah would not administer

corporal punishment to C.E., would work with C.E.'s counselor to learn how to handle C.E. more appropriately, and that the MCCS caseworker would work with the parents to learn more appropriate disciplinary techniques that would not physically harm the children. The amended case plan also identified Sarah's untreated mental health as a concern. Consequently, the plan required Sarah to undergo an intake at the Marion Area Counseling Center, to comply with any and all treatment plans established by the doctors and/or counselors, including taking any prescribed medications, and to maintain contact with the caseworker regarding her treatment. In addition, the caseworker was to follow up with Sarah to obtain a report from her regarding her treatment, to provide case management and casework counseling to Sarah, and to make recommendations when necessary for Sarah regarding her treatment.

{¶6} In January of 2009, MCCS received a report that Sarah had physically abused the four children that remained in her home and had sexually abused the youngest child. These children were removed from the home, and emergency temporary custody of the children was given to MCCS. However, these allegations were unsubstantiated by MCCS and the children were returned to their parents' custody in February of 2009, but were still in MCCS' protective supervision. In March of 2009, the parents separated, and the father moved out-of-state to find work.

**{¶7}** On April 28, 2009, the case plan was again amended. This time the plan noted that the need for the amendments were because the parents did not comply with key portions of the previous case plan and that the amendments were made to "make things more clear [*sic*] and easier for them to follow." These amendments included that the parents would obtain and maintain legal, gainful employment to support the family and would utilize local agencies, such as Job and Family Services and W.I.C., for services that would support the family. They were also to maintain caseworker-approved housing at all times, to maintain utilities, make efforts to pay off outstanding debts to utility companies, and to report any changes in residence to the caseworker within 72 hours. Sarah was also required to ensure that the children had healthy meals and healthy snack options and would keep a food log and menus for the caseworker to show what the children were eating. The plan further required that the children not be given soda pop except under limited circumstances, that the caseworker would check the home's refrigerator for the presence of milk and juice for the children, that the parents would establish a regular routine for the children, and that the caseworker would visit the home every other week. Once again, the plan required Sarah to attend all counseling appointments, to follow all recommended treatment, and to report to the caseworker regarding her counseling and how she was using it in her every day life with the children.

{¶8} On Monday, May 4, 2009, the caseworker received a call from Margo Hazlett, Sarah's mother, to report that she had the children. Hazlett reported that Sarah left the children in her care the preceding Friday and was supposed to return that same night but failed to do so. Hazlett was unable to care for the children any longer. In addition, Hazlett received text messages from Sarah, which caused her to be concerned for Sarah's mental well being. Hazlett also showed these messages to the caseworker. At that point, MCCS removed the children from Hazlett's home, placed them in foster homes, and filed motions for emergency temporary custody of the four children, which were granted. A full hearing on these motions was held on June 3, 2009, and neither parent attended. Temporary custody to MCCS was continued.

{¶9} On November 16, 2009, MCCS filed for permanent custody of all five children. A hearing on these motions was conducted on March 23 and April 6, 2010. Thereafter, the trial court granted permanent custody of all five children to MCCS. This appeal followed, and Sarah now asserts five assignments of error.

### ASSIGNMENT OF ERROR I

**THE RECORD CONTAINS INSUFFICIENT EVIDENCE TO PROVE CLEARLY AND CONVINCINGLY THAT THE AGENCY MADE DILIGENT EFFORTS TO ASSIST MOTHER TO REMEDY THE PROBLEMS THAT CAUSED THE CHILDREN TO BE REMOVED AND THE CHILDREN COULD NOT BE PLACED WITH MOTHER WITHIN A REASONABLE TIME.**

**ASSIGNMENT OF ERROR II**

**THE FAMILY COURT ERRED TO MOTHER'S PREJUDICE BY ALLOWING THE CASEWORKER TO TESTIFY ABOUT WHAT C.E. TOLD HIM.**

**ASSIGNMENT OF ERROR III**

**THE FAMILY COURT ERRED TO MOTHER'S PREJUDICE BY ADMITTING EXHIBIT CSB2.**

**ASSIGNMENT OF ERROR IV**

**THE FAMILY COURT ERRED TO MOTHER'S PREJUDICE BY ADMITTING EXHIBIT CSB7.**

**ASSIGNMENT OF ERROR V**

**THE COMBINATION OF THE AFOREMENTIONED ERRORS ARE SUFFICIENT TO CALL INTO QUESTION THE VALIDITY OF THE FAMILY COURT'S CONCLUSIONS, DEPRIVING THE APPELLANT OF DUE PROCESS AND A FAIR TRIAL, AND AMOUNTING TO STRUCTURAL ERROR.**

*First Assignment of Error*

{¶10} In Sarah's first assignment of error, she asserts that the evidence did not sufficiently demonstrate that the children could not be placed with her within a reasonable time or should not be placed with her. More specifically, she contends that the evidence did not show that MCCS made diligent efforts to assist her in remedying the conditions that caused the children's removal, that she demonstrated a lack of commitment toward her children, or that she was unwilling to provide for her children's basic needs or prevent them from suffering neglect.

{¶11} Initially, we note that "[i]t is well recognized that the right to raise a child is an 'essential' and 'basic' civil right." *In re Franklin*, 3rd Dist. Nos. 9-06-12, 9-06-13, 2006-Ohio-4841, citing *In re Hayes* (1997), 79 Ohio St.3d 46, 48, 679 N.E.2d 680. The Supreme Court of Ohio has held that a parent "must be afforded every procedural and substantive protection the law allows." *In re Hayes*, supra, quoting *In re Smith* (1991), 77 Ohio App.3d 1, 16, 601 N.E.2d 45. Thus, it is with these constructs in mind that we proceed to determine whether the trial court erred in granting permanent custody of the children to the Agency.

{¶12} The Revised Code states that a trial court

> **may grant permanent custody of a child to a movant if the court determines at the hearing held pursuant to division (A) of this section, by clear and convincing evidence, that it is in the best interest of the child to grant permanent custody of the child to the agency that filed the motion for permanent custody and that any of the following apply:**
>
> **(a) The child is not abandoned or orphaned, has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period \* \* \* and the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents.**

R.C. 2151.414(B)(1)(a). In making a determination pursuant to R.C. 2151.414(B)(1)(a), "the court shall consider all relevant evidence." R.C. 2151.414(E). However, a court *must* enter a finding that the child cannot be placed with either parent within a reasonable time or should not be placed with

either parent if the court finds by clear and convincing evidence that any one of sixteen enumerated factors is present. R.C. 2151.414(E)(1-16).

{¶13} The Supreme Court of Ohio has held that "[c]lear and convincing evidence is that measure or degree of proof which will produce in the mind of the trier of facts a firm belief or conviction as to the allegations sought to be established." *Cross v. Ledford* (1954), 161 Ohio St. 469, 477, 120 N.E.2d 118. Further, "[i]t is intermediate; being more than a mere preponderance, but not to the extent of such certainty as is required beyond a reasonable doubt as in criminal cases. It does not mean clear and unequivocal." *Id.*, citing *Merrick v. Ditzler* (1915), 91 Ohio St. 256, 110 N.E. 493. In addition, when "the degree of proof required to sustain an issue must be clear and convincing, a reviewing court will examine the record to determine whether the trier of facts had sufficient evidence before it to satisfy the requisite degree of proof." *Cross*, supra (citations omitted); see, also, *In re Adoption of Holcomb* (1985), 18 Ohio St.3d 361, 368, 481 N.E.2d 613. Thus, we are required to determine whether the evidence was sufficient for the trial court to make its findings by a clear and convincing degree of proof.

{¶14} In this case, the trial court found by clear and convincing evidence that the children could not be placed with either parent within a reasonable time and should not be placed with either parent. In so doing, the trial court made three specific findings pursuant to R.C. 2151.414(E)(1), (4), and (14).

**{¶15}** These sections state:

**(1)   Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home.   In determining whether the parents have substantially remedied those conditions the court shall consider parental utilization of medical, psychiatric, psychological, and other social and rehabilitative services and material resources that were made available to the parents for the purpose of changing parental conduct to allow them to resume and maintain parental duties.**

**\* \* \***

**(4)   The parent has demonstrated a lack of commitment toward the child by failing to regularly support, visit, or communicate with the child when able to do so, or by other actions showing an unwillingness to provide an adequate permanent home for the child.**

**\* \* \***

**(14) The parent for any reason is unwilling to provide food, clothing, shelter, and other basic necessities for the child or to prevent the child from suffering physical, emotional, or sexual abuse or physical, emotional, or mental neglect.**

**{¶16}** In regards to R.C. 2151.414(E)(1), the Revised Code imposes a duty on the part of children services agencies to make reasonable efforts to reunite parents with their children where the agency has removed the children from the home.  R.C. 2151.419; see, also, *In re Brown* (1994), 98 Ohio App.3d 337, 344, 648 N.E.2d 576.  Further, the agency bears the burden of showing that it made

reasonable efforts. R.C. 2151.419(A)(1). "Case plans are the tools that child protective service agencies use to facilitate the reunification of families who * * * have been temporarily separated." *In re Evans*, 3rd Dist. No. 1-01-75, 2001-Ohio-2302. To that end, case plans establish individualized concerns and goals, along with the steps that the parties and the agency can take to achieve reunification. *Id*. Agencies have an affirmative duty to diligently pursue efforts to achieve the goals in the case plan. *Id*. "Nevertheless, the issue is not whether there was anything more that [the Agency] could have done, but whether the [Agency's] case planning and efforts were reasonable and diligent under the circumstances of this case." *In re Leveck*, 3rd Dist. Nos. 5-02-52, 5-02-53, 5-02-54, 2003-Ohio-1269, at ¶ 10.

{¶17} In the case sub judice, the testimony at the permanent custody hearing revealed that this family had the same caseworker, Brent Middleton, for nearly the entire length of their cases. Middleton testified that he provided case management and casework counseling and completed monthly home visits with the family to insure that the children were safe and having their needs met. Middleton also referred Sarah to the Marion Area Counseling Center to obtain a psychological assessment and for treatment recommendations for her mental health needs after C.E. was removed from the home because of being hit with an extension cord. On March 5, 2008, Sarah did an intake at the counseling center. Eight days later, Sarah submitted to a psychological evaluation by Dr. Diana

Wilkerson, a psychologist. Dr. Wilkerson prepared a written evaluation, which was admitted into evidence at the permanent custody hearing, and she testified at the hearing as well.

**{¶18}** Dr. Wilkerson testified that she diagnosed Sarah with bipolar disorder, post-traumatic stress disorder ("PTSD"), adjustment disorder with anxiety, and mixed personality disorder. Dr. Wilkerson explained that the diagnosis of PTSD and mixed personality disorder were largely based on Sarah's history of how she was raised, having been abused and in foster care from the age of nine to the age of eighteen. Further, her mixed personality disorder resulted because "in order to survive in the world she had to – in a very threatening environment from a lot of different directions – she had to learn maladaptive ways of interacting with other people." (Trial Trans., 3/23/10, at p. 126.) Over time, these became strongly imbedded and "very, very difficult to change." (id.) Dr. Wilkerson testified that this disorder requires intensive treatment to change the maladaptive features and that a person has to be really committed and understand that they have these problems in order to change them. As for the diagnosis of adjustment disorder with anxiety, Dr. Wilkerson testified that this is a transient diagnosis based upon the removal of C.E. but that it is not a disorder someone can overcome without counseling to resolve the issues.

**{¶19}** Based on her evaluation and the diagnoses that she made, Dr. Wilkerson recommended in her 2008 evaluation that Sarah receive a psychiatric

assessment to determine what medications were appropriate for her bipolar disorder and PTSD. She also recommended that Sarah receive therapy from a therapist who is certified in Dialectical Behavior Therapy, which is designed for individuals with personality disorders, because she opined that it "is the only therapy currently available that truly improves the functioning and personal relationships of these individuals." (CSB Exhibit 8.) She also did not recommend placing C.E. in Sarah's care at that time because Sarah was under extreme emotional distress and the likelihood of abuse occurring would increase if C.E. was in Sarah's care because of the mental problems from which she suffered.

{¶20} Dr. Wilkerson further explained Sarah's evaluation at the permanent custody hearing. In particular, she testified that a person with Sarah's issues cannot improve on her own, particularly someone with bipolar disorder because it is a biochemical issue that can only be managed through medication. Thus, with no medication for her bipolar disorder and her personality disorder compounding that issue, Sarah would "have a very difficult time coping with the stresses of raising young children." (Trial Trans., 3/23/10, at p. 131.) In addition, Dr. Wilkerson testified that Sarah would need a minimum of a year of intensive therapy before her children could be returned to her care.

{¶21} After being evaluated by Dr. Wilkerson, Sarah returned to the counseling center and a treatment plan was created for her. Sarah saw a nurse practitioner at the counseling center and was prescribed two medications: Seroquel

XR, a mood stabilizer, and Buspar for depression. She saw the nurse practitioner on three occasions, but she did not return to the counseling center after May 8, 2008. Sarah also informed Middleton that she stopped taking the medications prescribed to her because of the way they made her feel.

{¶22} At the permanent custody hearing, Sarah testified that she stopped taking the Seroquel because it made her tired and she had an infant at the time. She also testified that she did not take the Buspar because she had taken it when she was twelve and "it just makes me crazier[.]" (Trial Trans., 3/23/10, at p. 172.) Because the counseling center would not stop prescribing those medications for her, she elected to stop going there. However, she did go to the We Care Center in Hardin County, Ohio, for counseling while living there with her mother in May or June of 2009, but she only went to two counseling sessions because she moved back to Marion after her mother no longer permitted her to live with her. Sarah further testified that she was not currently on any type of medication, was not receiving any type of therapy, and had not complied with the treatment recommendations given to her.

{¶23} In addition to the referral for a mental health assessment and treatment recommendations, Middleton testified he discussed other issues of concern with Sarah and the children's father and made recommendations to them. For instance, when they had marital issues and problems with domestic violence, Middleton discussed these issues with them and expressed to them the need for

marital counseling and how to properly address their anger problems. In addition, Sarah testified that Middleton counseled her on disciplinary techniques, such as time-outs, to use with the children rather than physical discipline.

{¶24} Middleton also discussed the case plan and its subsequent amendments with the parents and stressed to them the importance of complying with the case plan because the children could be permanently removed from them. In fact, when the youngest four children were removed from the home based on the physical and sexual abuse allegations, which were later found to be unsubstantiated, Middleton decided to amend the case plan to make it more detailed and clearer for the parents to understand because the parents had been non-compliant with several areas of the plan. He then discussed the amended case plan with the parents, who were both in agreement with the plan.

{¶25} He further testified that if there were any issues or if the family needed anything, he would try to assist them in getting whatever it was they needed. For instance, MCCS provided the family with four beds for the children while they were in their mother's care. Middleton advised Sarah of the existence and whereabouts of food pantries in the Kenton area when she lived in Kenton to ensure that the children had food. He assisted Sarah in obtaining funds through MCCS to help purchase a refrigerator, to purchase gas cards, and to get an apartment. He also provided her with several bus passes to assist her when she needed transportation.

{¶26} When the father moved to another state and did not provide sufficient financial support for the children, Middleton discussed the issue with the parents and advised them that the father could establish a payee who he trusted so that he could send the payee money to provide housing and maintain utilities for the family. However, the father informed Middleton that there was no one who he trusted to do that for him. Middleton also counseled the family on proper nutrition for the children, including advising Sarah that the children were too young to drink soda pop, and discussed the need to ensure that the children were receiving proper medical and dental care.

{¶27} Despite all of this assistance, Sarah did not substantially comply with the case plan. She had at least six different residences during the pendency of these cases. Many times she did not report these changes to Middleton although the case plan required that she do so, including a period of time from July to September of 2008, wherein Middleton had no idea where the family was living. At the time of the permanent custody hearing, Sarah lived in a friend's apartment, a friend whom she had known for approximately six months. Although Sarah testified that the apartment had adequate room for the children, Middleton stated that it was not adequate for five children and two adults because it had only two bedrooms. Further, Sarah admitted that she had no transportation, no home, was living from home to home, and could not put her children through that. Notably, Sarah did not testify that she sought further assistance from MCCS to obtain

housing, although she would have known that this was a possibility given the fact that MCCS previously provided the family with funds to help obtain housing. In addition, the father did not have stable housing for the children because he was being detained by the federal authorities for possible deportation to Mexico.

{¶28} Sarah also never obtained and maintained any type of gainful employment despite Middleton discussing the requirements of the case plan and informing her of the consequences of not complying with the case plan. She testified that she could not get a job because she did not drive and did not have a diploma or GED. However, she stated that she never attempted to obtain a driver's license. Although she attended GED classes, she never took the GED examination. Sarah testified that she did not take the GED examination because she had no one to watch the children. Yet, she offered no explanation as to why she did not take the examination after May 4, 2009, when the children were no longer in her care. Also, while the father had periods of employment, by March of 2009, he refused to provide adequate support for his children.

{¶29} The parents also failed to send P.E., who was the only child in their home of school age at the time, to school regularly or even enroll her in school until a number of weeks after school started. The failure to send P.E. to school resulted in criminal charges against Sarah for which she was found guilty in December of 2008. Shortly thereafter, the children were temporarily removed by MCCS. Once they were returned, P.E. began missing school again, resulting in a

contempt action against Sarah. When she failed to show to the contempt hearing, a bench warrant was issued and Middleton and Gary Braun, the truancy officer for the Ridgemont School District where P.E. was enrolled, attempted to locate Sarah and the children but were unsuccessful. Eventually, Braun found Sarah living in a subsidized housing unit in Kenton, Ohio, which is in Hardin County. He informed Sarah that she should enroll P.E. in the Kenton School District and that the bus would pick up P.E. at their housing unit. Braun also filled out a withdrawal form for Ridgemont and an enrollment form for Kenton for P.E., gave the enrollment form to Sarah, and asked her to take it to the Kenton Board of Education the following day. Sarah never did, and a week or two later, she left her children with Hazlett, resulting in the removal of the children from Sarah's care.

{¶30} Further, the case plan required that the parents ensure the physical well-being, including dental health, of their children. I.E. and P.E. had severe dental problems, requiring extensive treatment at Children's Hospital. However, Sarah cancelled multiple appointments with their dentist and neither parent followed-up with a dentist, leaving them untreated and experiencing pain when eating and drinking for quite a while. The children went without dental care until MCCS actually received temporary custody of them and got them back into the dentist for treatment. By then, I.E.'s abscesses were so extended that she was placed ahead of a number of other patients because of the dentist's concern that the infection could be fatal if left untreated for too long. In the end, sixteen of

I.E.'s twenty baby teeth and nine of P.E.'s twenty baby teeth had to be treated. Included in the treatment of I.E., who was five at the time, and P.E., who was seven at the time, were multiple teeth extractions and several crowns.

{¶31} In addition, visitation was regularly scheduled with the parents and the children. However, Sarah missed a large number of visits with her children when they were in MCCS' custody despite the fact that Middleton provided gas cards and bus passes to her. The father also missed a number of visits when he was out-of-state and had no contact with the children after being detained for possible deportation.

{¶32} Given all of this evidence, we cannot conclude that the trial court erred in finding that MCCS made diligent efforts to assist the parents in remedying the problems that caused the children to be removed. To the contrary, MCCS' case planning, particularly the referral to counseling for Sarah's mental health issues and the April 2009 amended case plan that was done in an effort to more specifically detail the concerns and requirements of the plan in order to better assist the parents in complying with it so that the children could be returned to them, and Middleton's efforts to achieve the goals of the case plan were more than reasonable and diligent under the circumstances of this case.

{¶33} Additionally, we find that the record provided ample evidence for the trial court to find by clear and convincing evidence that despite the efforts of MCCS, Sarah failed continuously and repeatedly to remedy the conditions that

caused the children's removal. For example, MCCS first became involved with the family due to the emotional abuse of C.E. by the parents. He was subsequently removed because of physical abuse by Sarah. Throughout this case, Sarah's mental health and how it relates to her behavior towards her children has been a major concern, which is why she was given a psychological evaluation and told to follow the recommended treatment. In fact, as previously discussed, Dr. Wilkerson did not believe it was safe to return C.E. to his mother's care until her mental disorders were under control, which she opined would take, at minimum, a year of *intensive* therapy to accomplish. Instead of seeking help and following the advice of the trained and educated mental health professionals, Sarah elected not to comply with the case plan because she did not like the way the medication made her feel. A little over a year after Dr. Wilkerson's evaluation, during which time Sarah received little to no treatment due to her own unwillingness, the other children were then removed from the home after Sarah left them with her mother and sent text messages that caused concern over her mental stability.

{¶34} The trial court found and the record supports that it was necessary for Sarah to participate in mental health treatment where she could be educated about why she behaves the way she does and learn to behave differently as well as be provided with the medication necessary to improve her condition. Further, the court found and the record supports that her failure to submit to treatment renders it both unsafe and not in the children's best interests to return them to her. Thus,

-21-

Sarah's behavior in this regard alone demonstrates that the she failed continuously and repeatedly to remedy the conditions that caused the children's removal.

{¶35} Moreover, the trial court did not err in finding that the parents demonstrated a lack of commitment toward the children by not regularly visiting them (having missed a substantial amount of scheduled visits with the children even though Middleton provided her with bus passes and gas cards), by not providing stable housing, and by not caring for their physical and emotional needs. Furthermore, the record amply supports the trial court's finding that the parents were unwilling to provide for the basic needs of their children. For example, the parents did not send P.E. to school on a regular basis, did not provide stable housing for the children, and did not take care of the children's dire dental needs, which could have resulted in the death of two of the children due to the extensive infections they had.

{¶36} Any one of the aforementioned findings supported the trial court's determination that the children could not be placed with the parents within a reasonable time or should not have been placed with the parents. Therefore, we do not find that the trial court erred in making such a finding, and the first assignment of error is overruled.

*Second, Third, and Fourth Assignments of Error*

{¶37} In her next three assignments of error, Sarah contends that the trial court erroneously admitted certain evidence, which should not have been

permitted because it was hearsay and did not qualify under any of the exceptions to the hearsay rule. The evidence at issue consisted of testimony by Middleton as to what C.E. told him regarding being struck with an extension cord and two exhibits: the children's visitation log and a compilation of school attendance information for P.E.

{¶38} Initially, we note that the decision as to whether to admit evidence is left to the discretion of the trial court, and we will not disturb such a decision absent an abuse of discretion. *State v. Awkal* (1996), 76 Ohio St.3d 324, 667 N.E.2d 960. An abuse of discretion "connotes more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary or unconscionable." *Blakemore v. Blakemore* (1983), 5 Ohio St.3d 217, 219, 450 N.E.2d 1140.

{¶39} Sarah's first contention in this regard is that Middleton should not have been allowed to testify about C.E.'s statements to him concerning the extension cord incident. Our review of the record reveals that Middleton did testify about what C.E. told him, and counsel for Sarah objected to this testimony based on the hearsay rule. "Hearsay" is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Evid.R. 801(C). Generally, hearsay is not admissible. Evid.R. 802. There are, however, a number of exceptions to the hearsay rule. See Evid.R. 803-807.

{¶40} In the case sub judice, this evidence was not used for the truth of the matter asserted, i.e. that Sarah hit C.E. with an extension cord. That matter had previously been litigated when C.E. was removed in February of 2008. This testimony served to explain MCCS' actions of removing C.E. from the home, which is necessary in order to determine the reasonableness of some aspects of the case plan and whether diligent efforts were made by MCCS to remedy the problems that caused C.E. to be removed. Thus, it was not hearsay, and we do not find that the trial court abused its discretion in admitting this evidence.

{¶41} In addition, even if this testimony was admitted for the truth of the matter asserted, rendering it inadmissible hearsay, any error in its admission was harmless. The trial court already had this information because of the court action that occurred in February and March of 2008, when it granted temporary custody of C.E. to MCCS. Further, this information was also contained in the amended case plan that the court adopted and made a part of the record in March of 2008. Accordingly, the second assignment of error is overruled.

{¶42} In regards to the two exhibits Sarah maintains were erroneously admitted into evidence, we first address the visitation logs of MCCS that showed the dates on which visitation was scheduled, who attended, and whether those who did not attend provided any type of reason for their absence or simply did not show. Sarah asserts that this exhibit, CSB 2, was inadmissible because it was hearsay and that Middleton should not have been permitted to testify about its

contents because he did not have personal knowledge about the assertions contained in those logs.

**{¶43}** One exception to the hearsay rule allows for the admission of records of regularly conducted activity. Evid.R. 803(6). Evidence Rule 803, in relevant part, states:

> **The following are not excluded by the hearsay rule, even though the declarant is available as a witness:**
>
> **\* \* \***
>
> **(6) Records of regularly conducted activity. A memorandum, report, record, or data compilation, in any form, of acts, events, or conditions, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record, or data compilation, all as shown by the testimony of the custodian or other qualified witness or as provided by Rule 901(B)(10), unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness.**

Evid.R. 803(6).

**{¶44}** Middleton testified that the visitation log was a document kept by MCCS, that the case aids who work in the visitation center prepared and maintained the log, and that a visitation log is kept in every case that MCCS has with a family. Middleton further testified that although he did not keep the actual logs in his case files, each is always accessible to him on the agency computers and that he uses them when working with a family so that he can determine

whether the parents are visiting their children and how those visits are going. Although Middleton testified that he was not the custodian of the visitation records of MCCS, as the caseworker for the children throughout the time that the children were in MCCS' temporary custody he was qualified to discuss these records and to provide the testimony necessary to have the logs deemed "records of regularly conducted activity." Thus, this exhibit was admissible as an exception to the hearsay rule, and the trial court did not abuse its discretion in admitting them.

{¶45} Further, Middleton's testimony also established that he did have personal knowledge on the matter. He used the records as a resource to determine whether the parents were visiting their children. He also discussed visitation and the lack of attendance by the parents with them. In fact, his discussion with Sarah about missed visitations by her led to him providing her with bus passes. Thus, he was intimately familiar with the parents' exercise of visitation with their children.

{¶46} Given Middleton's role with this family and that he had the responsibility of monitoring when and if the parents were visiting their children, we do not find that the trial court's decision to admit the visitation logs or to permit Middleton to testify about the parents' visitation with the children was an abuse of discretion. Moreover, Sarah testified about her attendance at visitation and was free to dispute the accuracy of those logs and/or the testimony provided by Middleton. Instead, she acknowledged the accuracy of those records and chose to explain her reasons for missing a number of visits. Her explanations for non-

attendance at multiple visitation times consisted mostly of issues related to transportation. In addition, she also confirmed Middleton's testimony that he gave her bus passes so that this would no longer be an issue. Therefore, even assuming arguendo that this evidence was inadmissible, any such error was harmless as Sarah provided largely the same testimony and confirmed the trustworthiness of the information contained in the log. Moreover, as previously discussed, the trial court had ample evidence, even without this information, to grant MCCS' motions for permanent custody. Accordingly, the third assignment of error is overruled.

{¶47} Lastly, Sarah maintains that the trial court erred in admitting CSB Exhibit 7 because it was hearsay. This exhibit consisted of a number of documents in support of the testimony of Gary Braun, the truancy officer, such as court documents and attendance records of P.E. from the Ridgemont School District. Our review of the record indicates that counsel for MCCS requested that this exhibit be admitted, opposing counsel objected, and counsel for MCCS withdrew the exhibit. (Trial Trans., 3/23/10, at pp. 161-163.) This exhibit never having been admitted, the fourth assignment of error is moot and, consequently, is overruled.

*Fifth Assignment of Error*

{¶48} In Sarah's fifth assignment of error she contends that the trial court's failure "to apply the Rules of Evidence is so egregious that it rises to the level of a structural error." In light of our discussion in the previous three assignments of

error and our holding that the trial court did not err in its admission of evidence in the three instances raised by Sarah, the fifth assignment of error is also overruled.

{¶49} For all of these reasons, the judgments of the Common Pleas Court, Juvenile Division, of Marion County, Ohio, are affirmed.

*Judgments Affirmed*

**WILLAMOWSKI, P.J., and PRESTON, J., concur.**

**/jnc**